104 Cal.Rptr.2d 159 (2001)
86 Cal.App.4th 1237
Joel DROUET, Petitioner,
v.
The SUPERIOR COURT of the City and County of San Francisco, Respondent; Jim Broustis et al., Real Parties in Interest.
No. A092016.
Court of Appeal, First District, Division One.
February 7, 2001.
Review Granted May 23, 2001.
*161 Andrew M. Zacks, San Francisco, James B. Kraus, San Diego, Law Offices of Andrew M. Zacks, San Francisco (Attorneys for PetitionerJoel Drouet).
William M. Simpich, Oakland, Marc S. Janowitz, San Francisco (Attorneys for Real Parties in InterestJim Broustis & Ivy McClelland).
*160 MARCHIANO, J.
The Ellis Act (Gov.Code, § 7060 et seq.) provides a statutory procedure allowing a landlord to remove rental units from the market and leave the landlord business and, if necessary, evict tenants. Civil Code section 1942.5 provides for an affirmative defense to eviction, as well as an independent action for damages, when the eviction is in retaliation for the exercise of a tenant's rights. This case raises the issue whether a tenant facing eviction under the Ellis Act may raise an affirmative defense of retaliatory eviction under Civil Code section 1942.5, when the landlord has complied with the procedural requirements of the Ellis Act to remove rental units from the market. We conclude that the Legislature did not intend that the Ellis Act allow a tenant to prevent a landlord from removing property from the rental market by resisting eviction through an affirmative defense of retaliatory eviction. But the tenant retains the right to an independent action for damages provided by the retaliatory eviction statute.
Petitioner Joel Drouet owns rental property in San Francisco. He withdrew his rental property from the rental market *162 under the Ellis Act, and filed an unlawful detainer action to evict his tenants, real parties in interest Jim Broustis and Ivy McClelland, when they would not move out. Real parties raised the affirmative defense of retaliatory eviction. Petitioner moved for summary adjudication of that affirmative defense in his favor, on the ground that the defense was not legally available in Ellis Act proceedings. The trial court denied petitioner's motion. Petitioner sought writ review in the Appellate Division of the San Francisco Superior Court. In a published opinion, the Appellate Division disagreed with the trial court and issued the writ to compel the trial court to grant the motion on the ground that the defense was unavailable.
We transferred this case from the Appellate Division pursuant to California Rules of Court, rule 62, in order to settle an important question of law. We agree with the Appellate Division and grant the petition for writ of mandate.

I. FACTS
The material facts are essentially undisputed. Petitioner owns a two-unit apartment building at 378-380 San Carlos Street in San Francisco. Real parties rented the unit at 378 San Carlos, a two-bedroom apartment, on a month-to-month basis. Real party Broustis lived in the unit for 12 years. By the time of the proceedings below, real party McClelland had lived with Broustis for approximately one year.
Apparently, the landlord-tenant relationship was strained. The Appellate Division noted that petitioner and real party Broustis "have had conflicts for many years," and that the conditions of the apartment purportedly required real party Broustis to make several repairs and deduct them from his rent. In their opposition to the motion for summary judgment, and in answers to interrogatories, real parties claimed that in April 1999 they informed petitioner that they believed they had been overcharged $411 for garbage bills since 1991, and were going to deduct this amount from their August 1999 rent. Real parties also orally complained about needed repairs to the shower, stairs, and sewage line. Petitioner did not dispute these factual allegations in his reply to the opposition.[1]
On August 5, 1999, petitioner commenced Ellis Act proceedings on the San Carlos rental units by filing a "Notice of Intent to Withdraw Residential Rental Units from the Rental Market" and a "Memorandum of Notice Regarding Withdrawal of Rental Unit from Rent or Lease" with the San Francisco Residential Rent Stabilization and Arbitration Board (Board).[2]
On that same day, and pursuant to Civil Code section 1946, petitioner served on real parties a written Termination Notice to quit the premises and deliver up possession by October 4, 1999. The Notice of Intent and Memorandum of Notice were attached to the Termination Notice. Petitioner then filed a second Notice of Intent and Memorandum of Notice with the Board, indicating that he had taken the appropriate steps to terminate all tenancies in the property by giving proper notice to his tenants of the termination of their tenancies. On September 7, 1999, petitioner recorded a copy of the Memorandum of Notice with the Board, and recorded another copy with the Recorder's Office of the City and County of San Francisco.
*163 It is undisputed that petitioner complied with all procedural requirements of the Ellis Act. Nevertheless, real parties did not quit the premises by October 4, 1999.
On October 6, 1999, petitioner filed a complaint for unlawful detainer in the San Francisco Superior Court, sitting as a court of limited civil jurisdiction. The complaint alleged that petitioner had complied with the Ellis Act to remove the units from the rental market but that real parties remained in possession despite being served with notice to quit. Real parties answered the complaint and alleged four affirmative defenses, including retaliatory eviction. Petitioner moved for summary adjudication on each of the four affirmative defenses. The superior court granted the motion in part but denied it with regard to retaliatory eviction.
Petitioner then sought a writ of mandate in the Appellate Division of the San Francisco Superior Court, to compel the trial court to set aside the denial of summary adjudication on the ground that the defense of retaliatory eviction is legally unavailable in Ellis Act unlawful detainer proceedings. After briefing and oral argument, the Appellate Division held that the defense of retaliatory eviction was not available and issued the writ of mandate to compel the trial court to reverse its denial of petitioner's motion for summary adjudication. We granted transfer.

II. DISCUSSION
In a writ proceeding challenging a denial of summary adjudication, we review the trial court's ruling de novo. (Buss v. Superior Court (1997) 16 Cal.4th 35, 60, 65 Cal.Rptr.2d 366, 939 P.2d 766; Dyer v. Superior Court (1997) 56 Cal.App.4th 61, 65, 65 Cal.Rptr.2d 85.) In the present case there are no disputed issues of fact material to the legal issue of whether the affirmative defense of retaliatory eviction is available in an unlawful detainer proceeding filed under the Ellis Act. Thus, our task is to decide that legal issue on the undisputed facts and determine whether petitioner is entitled to summary adjudication as a matter of law. (56 Cal.App.4th at pp. 65-66, 65 Cal.Rptr.2d 85.)
We begin at the headwaters of any Ellis Act discussion: Nash v. City of Santa Monica (1984) 37 Cal.3d 97, 207 Cal.Rptr. 285, 688 P.2d 894 (Nash). Nash addressed the validity of a provision of the Santa Monica City Charter which severely restricted the removal of rental units from the housing market. (Id. at p. 99, 207 Cal.Rptr. 285, 688 P.2d 894.) The charter provision was enacted in response to a severe shortage of rental housing caused by the so-called "Demolition Derby," a 15-month period in which Santa Monica landlords demolished over 1300 rental units and converted hundreds of others to condominiums. (Id. at p. 100, 207 Cal.Rptr. 285, 688 P.2d 894.)
To alleviate the rental housing shortage, the charter provision required a permit from the Santa Monica Rent Control Board before any landlord could demolish or convert rental units. Such a permit was granted only if the Rent Control Board found that (1) the units were not occupied by, or could not be afforded by, persons of low or moderate income; (2) removal of the rental units from the market would not adversely affect the housing supply; and (3) the landlord could not make a reasonable return on his investment. (Nash, supra, 37 Cal.3d at p. 101, 207 Cal.Rptr. 285, 688 P.2d 894.)
Nash, a Santa Monica landlord, decided to leave the business of rental housing and tear down his buildings. Nash was not eligible for a demolition permit because his tenants were of low or moderate income, and the demolition of the building would, as Nash conceded, adversely affect the housing supply. (Nash, supra, 37 Cal.3d at pp. 101-102, 207 Cal.Rptr. 285, 688 P.2d 894.) Nash sought a writ of mandate in the Los Angeles Superior Court, which ruled in his favor. (Id. at p. 102, 207 Cal.Rptr. 285, 688 P.2d 894.)
*164 On the City's appeal, the Supreme Court reversed. The court rejected Nash's argument that he had a right to go out of the apartment rental business, but the City of Santa Monica was forcing him to remain in that business against his will. (Nash, supra, 37 Cal.3d at pp. 102-103, 207 Cal. Rptr. 285, 688 P.2d 894.) The Supreme Court reasoned that Nash was free to relinquish personal involvement with the rental property by hiring a property manager; withholding units from the rental market as they became vacant; or selling the property to someone willing to continue in the rental housing business. (Id. at p. 103, 207 Cal.Rptr. 285, 688 P.2d 894.) The court further held that the restrictions imposed on Nash by the charter provision were "indirect and minimal," and constituted a permissible form of regulation of property ownership to satisfy Santa Monica's "legitimate goal of maintaining adequate rental housing." (Id. at pp. 104-105, 109, 207 Cal.Rptr. 285, 688 P.2d 894.)
In response to the Nash decision, the Legislature enacted the Ellis Act in 1985 (the Act). (Stats.1985, ch. 1509, § 1.) "The Legislature, under the apparent impression that the Nash court had denied the existence of a `"fundamental right" to cease doing business as a landlord' [citation], passed the Ellis Act to alleviate the plight of landlords." (Bullock v. City and County of San Francisco (1990) 221 Cal. App.3d 1072, 1096, 271 Cal.Rptr. 44.)
The core provision of the Act states: "No public entity ... shall, by statute, ordinance, or regulation, or by administrative action implementing any statute, ordinance or regulation, compel the owner of any residential real property to offer, or to continue to offer, accommodations in the property for rent or lease." (Gov.Code, § 7060, subd. (a).)[3] The Ellis Act primarily focuses on rental accommodations in apartment buildings. (§ 7060, subd. (b); Values v. Santa Monica Rent Control Bd. (1990) 221 Cal.App.3d 1116, 1122, 270 Cal. Rptr, 636.)
The Act provides that a public entity which has a rent control ordinance in effect may impose certain procedural requirements on a landlord's removal of rental units.[4] The landlord may be required to provide written notice to the public entity, and state under penalty of perjury the number and location of the rental units, the amounts of applicable rents, and the names of all tenants. (§ 7060.4, subd. (a).) The public entity may also require the landlord to record with the county recorder a memorandum summarizing the provisions of the notice, save for provisions such as tenants' names which are deemed confidential, and certifying that legally proper actions have been initiated to terminate existing tenancies. (§ 7060.4, subd. (b).)
As it read at the time of the proceedings pertinent to this case, the Act provided that the landlord-tenant relationship would continue through a 60-day grace period following the filing of a memorandum of notice certifying that the landlord had taken steps to terminate a tenancy. Until that grace period expired, the tenancy would not be terminated, and the rental accommodations would remain on the rental market. "[T]he date on which the accommodations are withdrawn from rent or lease for purposes of [the Act] is 60 days from the [date of] delivery ... of that [memorandum of] notice to the public entity." (§ 7060.4, former subd. (a).) The Act was amended in 1999 to move the provision just quoted from subdivision (a) to subdivision (b); to extend the grace period to 120 days; and to further extend it to *165 one year for a tenant who is over 62 or disabled and who has lived in the rental unit for at least one year, provided that certain conditions are met. (Stats.1999, ch. 968, § 3.) Under current law, and subject to the exception of more long-term disabled or elderly tenants, the rental accommodations are considered withdrawn from the rental market 120 days after the delivery of the landlord's memorandum of notice to the public entity.
The Act also provides that a public entity may require notice to tenants displaced by the Ellis Act. (§ 7060.4, subd. (c).) However, the public entity cannot require a notice period in excess of the statutory grace period. (Channing Properties v. City of Berkeley (1992) 11 Cal. App.4th 88, 96, 14 Cal.Rptr.2d 32 (Channing).)[5]
In the event that a tenant refuses to quit possession of the premises, the landlord may institute unlawful detainer proceedings under the Act. In such a proceeding "the tenant or lessee may appear and answer or demur pursuant to Section 1170 of the Code of Civil Procedure and may assert by way of defense that the owner has not complied with the applicable provisions of this chapter [i.e., the Ellis Act], or statutes, ordinances, or regulations of public entities adopted to implement this chapter, as authorized by this chapter." (§ 7060.6.) Noncompliance is the only defense specifically referenced as an eviction defense in the Ellis Act.
To safeguard tenants, the Ellis Act bristles with remedies for pretextual removals of rental units. "Concerned that the Ellis Act might provide landlords with a `loophole' to circumvent rent control laws, the Legislature included certain provisions to forestall evictions under the pretext of going out of business." (Friedman et al., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 2000)[¶] 5:360, p. 5-127.) If a landlord pretextually invokes the Ellis Act to go out of the rental business permanently, but then subsequently offers the removed units for rent within two years of the date of removal, the landlord faces a host of adverse consequences.
The Ellis Act allows a public entity to provide the following safeguards against such pretextual evictions. Upon return to the rental market, the removed units are subject to the same rent controls that would have been applicable had they not been removed, subject to rent adjustments permitted by the rent control law. (§ 7060.2, subds.(a)d), (b)(1).) The owner is liable to the displaced tenants for both actual and punitive damages. (§ 7060.2, subd. (a)(2).) The public entity may institute a civil proceeding against the owner for punitive damages based on the displacement of the tenants. (§ 7060.2, subd. (a)(3).)
In addition, the displaced tenants have a right of first refusal: the owner must first offer a returned unit to the tenant displaced therefrom, provided that the tenant, within 30 days of displacement, has given the owner written notice of the desire to consider an offer to renew the tenancy and an address to which such an offer could be directed. (§ 7060.2, subd. (a)(4).) The public entity is empowered to extend the life of the right of first refusal for up to 10 years. (§ 7060.2, subd. (b)(2).) If the removed units are demolished, and the landlord rebuilds rental units on the same property and places them on the market within five years of the original removal, the new units are subject to local rent controls on the basis of a "fair and reasonable return," even if the local rent control law ordinarily exempts new construction. (§ 7060.2, subd. (c).)
*166 The Ellis Act includes a statement expressing legislative intent: "It is the intent of the Legislature in enacting this chapter to supersede any holding or portion of any holding in Nash v. City of Santa Monica [1984] 37 Cal.3d 97[, 207 Cal.Rptr. 285, 688 P.2d 894,] to the extent that the holding, or portion of the holding, conflicts with this chapter, so as to permit landlords to go out of business." (§ 7060.7.) But in the next sentence the Legislature set forth a litany of limitations on the scope of the Ellis Act's provisions: "However, this act is not otherwise intended to do any of the following:
(a) Interfere with local governmental authority over land use, including regulation of the conversion of existing housing to condominiums or other subdivided interests or to other nonresidential use following its withdrawal from rent or lease under this chapter.
(b) Preempt local or municipal environmental or land use regulations, procedures, or controls that govern the demolition and redevelopment of residential property.
(c) Override procedural protections designed to prevent abuse of the right to evict tenants.
(d) Permit an owner to withdraw from rent or lease less than all of the accommodations, as defined by ... Section 7060.
(e) Grant to any public entity any power which it does not possess independent of this chapter to control or establish a system of control on the price at which accommodations may be offered for rent or lease, or to diminish any such power which that public entity may possess, except as specifically provided in this chapter.
(f) Alter in any way either Section 65863.7 relating to the withdrawal of accommodations which comprise a mobilehome park from rent or lease or subdivision (f) of Section 798.56 of the Civil Code relating to a change of use of a mobile-home park." (§ 7060.7, italics added.)
Another provision of the Act, section 7060.1, contains further limitations on the scope of the legislation. That section provides that "[notwithstanding Section 7060, nothing in this chapter" has any effect on a public entity's power to enforce residential rental contracts (§ 7060.1, subd. (a)); to regulate land use through planning, zoning, or subdivision map approvals (§ 7060.1, subd. (b); see City of Santa Monica v. Yarmark (1988) 203 Cal.App.3d 153, 167, 249 Cal.Rptr. 732 (Yarmark)); or to mitigate the adverse impact of the Ellis Act on certain low-income tenants by requiring the owner to pay relocation assistance authorized by the Act (§ 7060.1, subd. (c); see Yarmark, supra, 203 Cal. App.3d at p. 167, 249 Cal.Rptr. 732; Channing, supra, 11 Cal.App.4th at pp. 98-101, 14 Cal.Rptr.2d 32).
Of particular significance to the present case, section 7060.1 further provides that "nothing in this chapter ... [¶] ... [¶][s]upersedes any provision of Chapter 16 (commencing with Section 7260) of this division, Part 2.8 (commencing with Section 12900) of Division 3 of Title 2 of this code, Chapter 5 (commencing with Section 17200) of Part 2 of Division 7 of the Business and Professions Code, Part 2 (commencing with Section 43) of Division 1 of the Civil Code, Title 5 (commencing with Section 1925) of Part 4 of Division 3 of the Civil Code, Chapter 4 (commencing with Section 1159) of Title 3 of Part 3 of the Code of Civil Procedure, or Division 24 (commencing with Section 33000) of the Health and Safety Code." (§ 7060.1, subd. (d).)
A review of the statutes cited in section 7060.1, subdivision (d), reveals that the Ellis Act specifically does not supersede (1) the Relocation Assistance Act, designed to provide relocation assistance for persons and businesses displaced by programs and projects of a public entity, including acquisition and demolition (§§ 7260, 7260.5); (2) the California Fair Employment and Housing Act (FEHA) which, inter alia, forbids discrimination in housing on the *167 basis of "race, color, religion, sex, marital status, national origin, ancestry, familial status, disability, or sexual orientation" (§§ 12900, 12920); (3) statutes prohibiting unfair business practices; (4) the portion of the Civil Code entitled "Personal Rights," which includes the Unruh Civil Rights Act (Civ.Code, § 51 et seq.) and its prohibition of discrimination by business establishments on the basis of "sex, race, color, religion, ancestry, national origin, disability, or medical condition" (Civ.Code, § 51); (5) the portion of the Civil Code regulating the hiring of property, which includes the statutes governing the landlord's duty to provide tenantable housing (Civ.Code, §§ 1941, 1941.1) as well as Civil Code section 1942.5, the retaliatory eviction statute; (6) the unlawful detainer statutes; and (7) the Community Redevelopment Law.
Judicial construction of the Ellis Act has generally viewed the Act in relation to local ordinances rather than these numerous state statutes. Courts have uniformly construed the Ellis Act as a state law of preemptive effect, preventing local governments from imposing any additional requirements, external to the Act, on a landlord's decision to go out of the rental business. (See, e.g., Los Angeles Lincoln Place Investors, Ltd. v. City of Los Angeles (1997) 54 Cal.App.4th 53, 59-66, 62 Cal.Rptr.2d 600; Bullock v. City and County of San Francisco, supra, 221 Cal. App.3d at pp. 1100-1102, 271 Cal.Rptr. 44; Yarmark, supra, 203 Cal.App.3d at pp. 166-167, 249 Cal.Rptr. 732.) As stated, the purpose of the Act was to prevent local governments from enacting legislation which would prevent a landlord from removing property from the rental market.
The Yarmark court, the first to construe the Ellis Act, explained: "It is self-evident from the language of the Act that the Legislature intended to accomplish at least two objectives. The first is to prevent public entities from acting in a manner inconsistent with the Act such as to prevent landlords from withdrawing units and evicting tenants so they may go out of business. And the second is to allow landlords to utilize the summary eviction procedures in order to go out of business without the restraint of substantive defenses provided by local rent control ordinances...." Yarmark, supra, 203 Cal. App.3d at p. 166, 249 Cal.Rptr. 732, italics added.) "In passing the Ellis Act, the Legislature has explicitly indicated it will tolerate no local measures providing substantive grounds for defenses in unlawful detainer actions brought by landlords who wish to go out of business. Those substantive defenses are invalid to the extent they conflict with the Ellis Act. [Citation.]" (Id. at p. 171, 249 Cal.Rptr. 732.)
In short, a local rent control law or other measure may not impose an additional substantive burden on the landlord's right to remove rental units under the Ellis Act. Thus, a local rent control law may not require a landlord seeking to go out of business to either (1) prove the rental units are uninhabitable and incapable of being made fit for habitation in an economically feasible manner, or else (2) promise to develop new multifamily rental property subject to rent control and to some extent affordable by low income tenants. (Yarmark, supra, 203 Cal.App.3d at pp. 163-165, 171, 249 Cal.Rptr. 732; see Javidzad v. City of Santa Monica (1988) 204 Cal.App.3d 524, 529-531, 251 Cal.Rptr. 350.)
Likewise, a city ordinance may not condition the demolition of buildings removed under the Ellis Act on a finding that demolition would not be materially detrimental to neighborhood housing needs; that demolition involved only a hazardous, unstable or unrepairable structure; or that the landlord had promised to replace the demolished structure with the same number of housing units. (First Presbyterian Church v. City of Berkeley (1997) 59 Cal.App.4th 1241, 1252-1253, 69 Cal.Rptr.2d 710.) Neither can a local ordinance require a longer period of notice to *168 tenants than the Ellis Act grace period discussed above (Charming, supra, 11 Cal. App.4th at pp. 94-97, 14 Cal.Rptr.2d 32) or require the landlord to provide relocation assistance beyond that authorized by the Act in section 7060.1, subdivision (c). (11 Cal.App.4th at pp. 97-101, 14 Cal.Rptr.2d 32.)
But the present case does not involve a burden external to the Ellis Act imposed on a landlord by a local ordinance. Rather, the question we face is whether the Ellis Act itself provides that the defense of retaliatory eviction contained in another state law applies to eviction proceedings commenced under the Act. Thus, while we acknowledge the preemptive effect of the Ellis Act over such local ordinances, we must decide, as a matter of statutory construction, whether the provisions of the Ellis Act would permit a retaliatory eviction defense to an unlawful detainer action or would exclude that defense as a matter of law. In other words, once a landlord has properly invoked the Ellis Act, and triggered the final 120 days of the tenancy, can a tenant remain and challenge the landlord's right to evict on the ground that the landlord's reasons for invoking the Ellis Act violate the retaliatory eviction statute?
We first examine that statute's terms. Civil Code section 1942.5, part of the statutory scheme which generally governs landlord-tenant relationships, provides for an affirmative defense of retaliatory eviction in an unlawful detainer action. This defense arises when a tenant who is not in default of rent is evicted in retaliation for the exercise of certain enumerated tenant's rights. These rights include the giving of good faith notice to the landlord of the intent to "repair and deduct" under Civil Code section 1942, or the making of a complaint about the untenantability of the premises to the landlord or to a housing agency. (Civ.Code, § 1942.5, subd. (a).)[6]
Such a defense of retaliatory eviction arises if the landlord tries to evict the tenant within 180 days of the tenant's exercise of applicable tenant's rights. In addition, the defense may not be invoked more than once in any 12-month period. (Civ.Code, § 1942.5, subd. (b).) Generally, the tenant has both the initial burden of producing evidence and the ultimate burden of persuasion on the issue of whether the landlord acted with a retaliatory motive, and the landlord is free to present evidence of a good-faith, legally valid reason for the eviction. (Friedman et al., Cal. Practice Guide: Landlord-Tenant, supra, n 7:367-7:381, pp. 7-72 to 7-76; see Western Land Office, Inc. v. Cervantes (1985) 175 Cal.App.3d 724, 740-742, 220 Cal.Rptr. 784.)
In addition to the affirmative defense to an unlawful detainer action, an aggrieved tenant has an independent action for monetary damages, consisting of actual damages plus punitive damages of up to $1,000 for each retaliatory act committed with fraud, oppression, or malice. (Civ.Code, § 1942.5, subds.(f), (g); Friedman et al., Cal. Practice Guide: Landlord-Tenant, supra, n 7:385-7:388.1, pp. 7-76 to 7-78; see Rich v. Schwab (1998) 63 Cal.App.4th 803, 809, 75 Cal.Rptr.2d 170.)[7]
*169 We now turn to our exercise of statutory construction to explain why the defense of retaliatory eviction is not available in an Ellis Act unlawful detainer proceeding, but the tenant retains the right to an independent damage action.
"The fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citation.]" (O'Kane v. Irvine (1996) 47 Cal.App.4th 207, 211, 54 Cal.Rptr.2d 549.) "To determine the intent of legislation, we first consult the words themselves, giving them their usual and ordinary meaning. [Citations.]" (DaFonte v. Up-Right, Inc. (1992) 2 Cal.4th 593, 601, 7 Cal.Rptr.2d 238, 828 P.2d 140.) Where the statutory wording is clear a court "should not add to or alter [it] to accomplish a purpose that does not appear on the face of the statute or from its legislative history." (O'Kane v. Irvine, supra, 47 Cal.App.4th at p. 211, 54 Cal.Rptr.2d 549.) Furthermore, statutory language must be viewed in context, "... `keeping in mind the nature and obvious purpose of the statute where they appear.'" (Moyer v. Workmen's Comp. Appeals Bd. (1973) 10 Cal.3d 222, 230, 110 Cal.Rptr. 144, 514 P.2d 1224, quoting Johnstone v. Richardson (1951) 103 Cal. App.2d 41, 46, 229 P.2d 9.)
The issue before us is one of first impression. As we pass through these uncharted waters, the polestar of our journey is the intent of the Legislature. Each side to this litigation offers a tempting solution of ease and facility. Neither simple solution is tenable, and either, if adhered to, would draw us from our proper course and defeat the policies of the opposing statutes.
Real parties argue that the plain language of the Ellis Act preserves a tenant's right to the affirmative defense of retaliatory eviction in an Ellis Act unlawful detainer. They point to section 7060.1, subdivision (d), which explicitly states that the Ellis Act does not "supersede" that portion of the Civil Code which includes Civil Code section 1942.5. They conclude that because the Legislature used the term "supersede" in this provision, it intended to expressly retain the affirmative defense of retaliatory eviction in proceedings under the Ellis Act.
The argument has some persuasion at first blush. "Supersede" is a word of ordinary common meaning, which has been repeatedly recognized by courts. "... `Webster's Dictionary (2d ed.1935, unabridged), page 2533, defines "supersede" to mean "to sit above, be superior to," "[to] make void or useless, [especially] by a superior power; to make unnecessary or superfluous...."'" (County of Ventura v. George (1983) 149 Cal.App.3d 1012, 1016-1017, 197 Cal.Rptr. 245, quoting County of Los Angeles v. Ferguson (1979) 94 Cal. App.3d 549, 559, 156 Cal.Rptr. 565; see Woodmansee v. Lowery (1959) 167 Cal. App.2d 645, 651, 334 P.2d 991; In re Nunez (Bankr.9th Cir.1996) 196 B.R. 150, 156 ["The dictionary defines supersede as `to cause to be set aside' or `to replace'"]; Fowler v. Weiss (1988) 15 Conn.App. 690, 546 A.2d 321, 323 ["The plain meaning of supersede is `[t]o make obsolete, inferior, or outmoded ... to make void ... annul, override ... to make superfluous or unnecessary ... to take the place of ... to take precedence over...'"].)
We acknowledge that "the Legislature is presumed to have been aware of existing judicial ... constructions of terms, and to have adopted those meanings in framing subsequent statutes." (Bullock v. City and County of San Francisco, supra, 221 Cal.App.3d at p. 1096, 271 Cal.Rptr. 44.) We could conclude that, by the plain language of the Ellis Act and the *170 ordinary accepted meaning of "supersede," the Legislature has shown no intent that the Act supplant, make void, or override Civil Code section 1942.5 in its entirety indeed, had the Legislature intended that the affirmative defense of retaliatory eviction would not apply to Ellis Act evictions, it could have so indicated in clear and explicit language. We further note that a credible argument could also be made that section 7060.7, subdivision (c), was meant to preserve the retaliatory eviction defense in Ellis Act proceedings as a procedural protection designed to prevent abuse of the right to evict tenants. But the Legislature did not set forth anywhere what it meant by a "procedural" protection.
The issue before us does not lend itself to such a simple solution. In the Ellis Act context it would be a superficial act of interpretation to conclude that the use of the term "supersede," in reference to a broad and detailed statutory scheme of the Civil Code, necessarily meant that a particular eviction defensefound in a single statuteremained applicable. The Legislature did not single out section 1942.5, but broadly referenced Title 5, which includes sections 1925 through 1997.270.
We look to the various textual provisions of the Ellis Act in the light of the Act's overall nature and obvious purposei.e., the legislative intent underlying the Act. (See Moyer v. Workmen's Camp. Appeals Bd., supra, 10 Cal.3d at p. 230, 110 Cal.Rptr. 144, 514 P.2d 1224.) Well-founded rules of construction direct us to construe the Ellis Act and the retaliatory eviction statute together, to give effect to that overriding legislative intent. (See Select Base Materials v. Board of Equal. (1959) 51 Cal.2d 640, 645, 335 P.2d 672.) To apply that portion of the retaliatory eviction statute which provides for an affirmative defense against eviction would frustrate the clearly enunciated legislative intent of the Ellis Acti.e., that a landlord should have the right to go out of the rental business, within the Act's specified time periods and under its specific procedural requirements. "`"[I]n construing a statute the courts ... will construe the statute with a view to promoting rather than to defeating its general purpose and the policy behind it."`" (City of Costa Mesa v. McKenzie (1973) 30 Cal.App.3d 763, 770,106 Cal.Rptr. 569.)
This brings us to the second oversimplification from which we steer clear. Petitioner suggests the Ellis Act bestows upon landlords an unqualified right to go out of the rental market. We disagree.
An apartment is as much a castle to a renter as a home is to its owner. The Ellis Act right to go out of business is not a license for landlords to act in cavalier disregard of their tenants. The Legislature has imposed numerous restrictions on the landlord's right to go out of business. The right is not, as petitioner and some decisions describe it, "unfettered." (Yarmark, supra, 203 Cal.App.3d at p. 165, 249 Cal.Rptr. 732; see First Presbyterian Church v. City of Berkeley, supra, 59 Cal. App.4th at p. 1251, 69 Cal.Rptr.2d 710; Los Angeles Lincoln Place Investors, Ltd. v. City of Los Angeles, supra, 54 Cal. App.4th at pp. 61-62, 62 Cal.Rptr.2d 600.) On the contrary, the use of the term "unfettered" is an unfortunate misnomer.
The Yarmark court took the term from a Senate Judiciary Committee Analysis written when the Ellis Act was in its embryonic stage. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 505 (1985-1986 Reg. Sess.) as amended April 18, 1985, p. 2.) The Act then consisted of a mere 17 lines of textlittle more than the main section of the Act, section 7060. The Act did not contain the numerous, detailed provisions which were later added to limit the Act's scope, i.e., current section 7060.1, subdivisions (b) through (d), current section 7060.7, and the various provisions penalizing pretextual evictions. (Sen. Bill No. 505 (1985-1986 Reg. Sess.) as amended April 18, 1985.) The use of the term "unfettered" is an unhelpful anachronism which inaccurately characterizes the landlord's *171 right to go out of business, and which impedes an appropriate analysis of legislative intent.[8]
Like virtually all rights, the landlord's right to cease being a landlord is subject to the "fetters" and restrictions demanded by a complex society of competing values and interests. For instance, in its judgment the Legislature has provided that a landlord cannot go out of business selectively, by "Ellis-Acting" some units but not others. The Legislature has also provided that a landlord cannot go out of business as a pretext without suffering serious penalties.
There is a fundamental distinction between an Ellis Act unlawful detainer proceeding and one which is filed in the ordinary course of the typical landlord-tenant relationship. In the latter case the landlord remains in the rental business. Perhaps the landlord may have failed to fulfill the legal obligation to provide habitable premises, or the landlord may have retaliated against a tenant by initiating an unlawful detainer proceeding in response to an assertion of tenant's rights. But the landlord is still in the rental market, using the property to generate income from a commercial enterprise, and does not want to leave the market. In that situation the policies and sanctions of the retaliatory eviction statute, including its obvious deterrent effect, apply in full force because the landlord remains a deterrable actor in the rental market.
But in this case the landlord has left the rental market by the procedural mechanism authorized by the Legislature. While the former tenant has a 120-day grace period within which to relocate, the tenant must expeditiously surrender possession by the expiration of that time unless the landlord has violated Ellis Act tenancy termination procedures. In the typical Ellis Act case, the tenancy ceases to exist 120 days from such filing because the rental units are legally removed from the market. The landlord-tenant relationship no longer exists. Petitioner then stands as a non-commercial property owner seeking to remove from a non-revenue producing property a former tenant who has lost the right of possession. Because the lessor-lessee relationship no longer exists, there is no tenancy for the lessee to pay for, or rent to increase, or services to decrease within the meaning of Civil Code section 1942.5, subdivision (a).
We strive to construe statutes to reach a reasonable legislatively intended result (see DeYoung v. City of San Diego (1983) 147 Cal.App.3d 11, 18, 194 Cal.Rptr. 722, disapproved on another ground in Yamaha Corp. of America v. State Bd, of Equalization (1998) 19 Cal.4th 1, 15, 78 Cal.Rptr.2d 1, 960 P.2d 1031), and to harmonize competing statutes to effectuate the legislative policy. "[I]f a court can by any fair interpretation find a reasonable field of operation for two allegedly inconsistent statutes without destroying or preventing their intent or meaning from being operative, the court should do so." (2A Sutherland, Statutory Construction (5th ed. 1992) Criteria of Interpretation, § 45.12, pp. 61-62, footnote omitted.) It is unreasonable to conclude that in the process of making broad references to entire systems of statutes in the Ellis Act, the Legislature intended the defense of retaliatory eviction to apply to unlawful detainer proceedings under the Actafter the landlord has ceased to use the property as an income-generating asset. To conclude otherwise would erect an unintended, massive and daunting barrier between the right to go out of the landlord business and the practical ability to bring that right *172 to fruition in accordance with the purpose of the Ellis Act.
Moreover, we note that Civil Code section 1942.5, subdivision (d), provides that nothing in the statute limits the landlord's right to evict "for any lawful cause." Lawful cause arises when the tenant refuses to leave after the landlord has complied with the Ellis Act procedures. The Legislature provided a lawful method to leave the rental market and evict holdover tenants in the provisions of the Ellis Act, and in effect provided lawful cause for eviction despite a secondary motive that may be considered retaliatory under Civil Code section 1942.5. Subdivision (d) of Civil Code section 1942.5 acknowledges the landlord's overriding right to evict for "lawful cause." We also note that the Legislature in an evenhanded manner took great pains to protect tenants against pre-textual, bad faith Ellis Act evictions. The Legislature did not specify anywhere that tenants given the benefit of these extensive protections could also routinely invoke the retaliatory eviction defense to delay an allegedly bad faith eviction under the Ellis Act.
We find further evidence of legislative intent in the 1992 amendment to Civil Code section 1942.4, a companion to section 1942.5. Section 1942.4, in essence, permits an action for damages against a landlord who "demands or collects rent" when the premises are untenantable within the meaning of Civil Code section 1941.1; the landlord has been so informed by the housing authorities; the landlord has not repaired the property within 60 days of notice without good cause for the delay; and the condition of the property is not the doing of the tenant. (Civ.Code, § 1942.4, subd. (a).) The statute also permits a court to require the landlord to repair any condition of untenantability which significantly affects the health or safety of the tenants. (Civ.Code, § 1942.4, subd. (c).) In 1992 the Legislature added the provision mat "Nothing in this section shall require any landlord to comply with this section if he or she pursues his or her rights pursuant to [the Ellis Act]." Thus, the Legislature obviously intends that a landlord who has gone out of the rental business pursuant to the Ellis Act will no longer be liable for statutorily imposed repairs to untenantable buildings. The Legislature did not intend for a landlord to suffer an eviction defense based on tenant complaints about untenantability when the landlord no longer is required to restore the Ellis Acted property to a condition suitable for tenantstenants whom the landlord no longer expects to have.
The competing policies of the Ellis Act and the tenant's right against retaliatory eviction can be protected, promoted, and harmonized by interpreting the Ellis Act to disallow retaliatory eviction as an affirmative defense in an unlawful detainer proceeding, while allowing an independent damage action under Civil Code section 1942.5, subdivisions (f) and (g). This reasonable solution resolves the tension between the landlord's rights under the Ellis Act and the tenant's rights under the retaliatory eviction statute by giving effect to the legislative intent and policies of each, and also reconciles Government Code sections 7060.1, subdivision (d), 7060.6, and 7060.7. "`"[S]tatutes must be given a reasonable and common sense construction in accordance with the apparent purpose and intention of the lawmakersone that is practical rather than technical, and that will lead to a wise policy rather than to mischief or absurdity." [Citation.]'" (City of Costa Mesa v. McKenzie, supra, 30 Cal.App.3d at 770.) While the landlord's right to go out of business hinges on the ability to evict holdover tenants without undue delay, nothing in the Ellis Act or in its underlying policies excuses the landlord from subsequent liability for statutory damages for acting with retaliatory motives during the tenancy.[9]
The essence of the Ellis Act is to allow expeditious evictions to permit the landregarding retaliatory eviction is inconclusive *173 lord to leave the market. But the Act does not evidence a legislative intent that the entire retaliatory eviction statutenot just the defense against eviction, but the damages provision as wellbe inapplicable to an Ellis Act eviction. In fact, the Ellis Act states it does not "supersede" that section of the Civil Code of which section 1942.5 is a part. The Legislature wanted the protections of section 1942.5 available to tenants while at the same time protecting fundamental property rights of property owners. While the eviction defense may not be raised as a bar to prevent a property owner from returning rental property to a non-rental status, damages are not precluded to right wrongs inflicted before the tenancy terminated. In short, a landlord using the Ellis Act for retaliatory purposes may evictbut later may still suffer monetary consequences.
In sum, we hold that in unlawful detainer proceedings properly commenced under the Ellis Act, a tenant may not raise an affirmative defense of retaliatory eviction to prevent displacement, but retains the right to an independent action for damages under the retaliatory eviction statute.

III. DISPOSITION
The petition for writ of mandate is granted. Let a writ of mandate issue compelling respondent San Francisco Superior Court to set aside its order denying petitioner's motion for summary adjudication regarding the affirmative defense of retaliatory eviction, and to enter a new and different order granting said motion. Real Parties in Interest retain the right to bring an action for damages under Civil Code section 1942.5, subdivision (f). The parties shall bear their own costs of this writ proceeding.
STEIN, Acting P.J., and SWAGER, J., concur.
NOTES
[1] Contrary to assertions made at oral argument, nothing in the trial court record indicates that real parties exercised certain rights guaranteed by the First Amendment, such as petitioning the government with grievances, the exercise of which would justify a discussion of Barela v. Superior Court (1981) 30 Cal.3d 244, 252-253, fn. 7, 178 Cal.Rptr. 618, 636 P.2d 582, and authorities cited therein.
[2] The Notice and Memorandum involved both San Carlos rental units. Only 378 San Carlos, which was rented by real parties, is involved in this writ proceeding.
[3] Subsequent statutory citations are to the Government Code unless otherwise indicated. For the sake of style we frequently refer to the Ellis Act as "the Act," and use "owner" and "landlord" interchangeably.
[4] In San Francisco, those procedural requirements are found in the Residential Rent Stabilization and Arbitration Ordinance, San Francisco Administrative Code § 37.9A. Petitioner's compliance with these requirements is set forth in our statement of facts.
[5] Channing construed the notice provision of the older version of section 7060.4, when the grace period was 60 days instead of the current period of 120 days. The language of the amended statute's notice provision is not materially different except for the doubling of the grace period. We therefore assume Channing's analysis and holding to have continuing validity.
[6] In addition, a landlord may not evict a tenant in retaliation for organizing or participating in a tenants' rights organization, or for "lawfully and peaceably" exercising "any rights under the law." (Civ.Code, § 1942.5, subd. (c).) This subdivision has been "denominated a `boilerplate' provision because of its broad prohibition against retaliation by a landlord when a tenant has exercised valid legal rights under the law. [Citation.]" (Barela v. Superior Court, supra, 30 Cal.3d at p. 251, 178 Cal.Rptr. 618, 636 P.2d 582; see Friedman et al., Cal. Practice Guide: Landlord Tenant, supra, MI 7:363-7:364, p. 7-72.) A subdivision (c) defense is procedurally distinct in certain ways from a subdivision (a) defense; those distinctions are not pertinent to this opinion.
[7] We only summarize the defense of retaliatory eviction and do not intend to present a comprehensive discussion. A detailed treatment of the retaliatory eviction defense can be found in Friedman et al., Cal. Practice Guide: Landlord-Tenant, supra, KH 7:330-7:414, pp. 7-68 to 7-84, and 6 Miller & Starr, Cal. Real Estate (2d ed.1989) § 18:146, pp. 439-447. For a history of the defense in California, see Western Land Office, Inc. v. Cervantes, supra, 175 Cal.App.3d at pp. 732-740, 220 Cal.Rptr. 784. For its origins in common law, see Barela v. Superior Court, supra, 30 Cal.3d 244, 178 Cal.Rptr. 618, 636 P.2d 582, and Schweiger v. Superior Court (1970) 3 Cal.3d 507, 90 Cal.Rptr. 729, 476 P.2d 97.
[8] After Yarmark first used the term "unfettered," the subsequent cases cited in the text simply repeated that description without question. But we note that the Yarmark court immediately followed its use of the term "unfettered" with the caveat that the right to remove rental units had to be "consistent, of course, with guidelines as set forth in the Act...." (203 Cal.App.3d at p. 165, 249 Cal. Rptr. 732.)
[9] The sparse legislative history of the Ellis Act and does not deal with the implications of the competing policies. A Senate Judiciary Committee analysis states: "The bill would provide that its provisions would not supersede any rights of a tenant under the Unruh Civil Rights Act, the Fair Employment & Housing Act, the Civil Code, the unlawful detainer statutes, the Community Redevelopment Law, the relocation assistance laws, and the Unfair Business Practices Act. [¶] This provision would limit a landlord's right to go out of business if the exercise of that right would jeopardize a tenant's rights under state law. For example, this provision would probably prohibit a landlord from going out of business if the tenant had requested repairs or reported housing code violations. An eviction of the tenant under such circumstances could be deemed a prohibited retaliatory eviction." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 505 (1985-1986 Reg. Sess.) as amended May 15, 1985, p. 5.) (Italics added.)

Nothing in this passage is inconsistent with our holding that the tenant retains the right to sue for damages for retaliatory eviction, but loses the right to delay eviction with a Civil Code section 1942.5 defense in an Ellis Act unlawful detainer. We note that the language of the legislative history is tentative: the use of such equivocal terms as "probably" and "could" shows some uncertainty about the consequences of the statutory language. The Legislature did not address how these statutes operating in tandem with opposing goals may affect one another. The final version of the Ellis Act broadly referenced Title 5 and did not mention section 1942.5. Section 1942.5 is part of Title 5 which also contains sections 1925 through 1997.270, many of which have no applicability to an Ellis Act proceeding.